UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| CYNTHIA P. GIPSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO.: 2:13-CV-380-TLS |
| | ) |
| ARCELORMITTAL STEEL USA, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter comes before the Court on Defendant ArcelorMittal Steel USA's Motion for Summary Judgment [ECF No. 51], filed on November 30, 2016. The Defendant seeks judgment as a matter of law on Plaintiff Cynthia P. Gipson's claims for race discrimination and retaliation, pursuant to 42 U.S.C. § 2000, Title VII, and 42 U.S.C. § 1981, which were alleged in an Amended Complaint [ECF No. 11]. This matter is now fully briefed and ripe for the Court's review.

## BACKGROUND

**A.     Facts Relating to the Discrimination Claim**

The Defendant operates a steel plant in East Chicago, Indiana. (Rose Decl. ¶ 2, ECF No. 52.) The Plaintiff is an employee with the Defendant who works in the Security and Emergency Department as a Fire Service Technician/EMT, and most employees within that Department are represented by the United Steel Workers Local 1011 (the "Union"). (*Id.* ¶ 3.) The Plaintiff is a Black, Jamaican-American, and the only employee of such ancestry in the Security and Emergency Department. (Gipson Aff. ¶ 5, ECF No. 56-1.)

In 2011, the Defendant "agreed to allow employees in the Security and Emergency Services Department . . . to volunteer for paid paramedic training." (Rose Decl. ¶ 5.) The paramedic training course was administered by Methodist Hospital, included classroom and clinical components, and lasted for fifteen weeks. (Gipson Dep. 36:24–37:18, 63:23–64:4, ECF No. 52.) As part of its policy, the Defendant would "pay for paramedic training for one employee at a time, and . . . give that employee two paid days off to attend the training classes." (Rose Decl. ¶ 5.)

Ester Rosales,[1] a Hispanic employee senior to the Plaintiff, was the first employee to attend the paramedic training. (Gipson Dep. 35:14–17, Ex. 2.) Before the training, Rosales's regular schedule was to work Monday, Tuesday, Friday, Saturday, and Sunday, and take days off Wednesday and Thursday. (*Id.* 39:6–8, Ex. 2.) For her paramedic training, Rosales's schedule was adjusted so that her two paid days off to attend training classes were Monday and Thursday, her paid days working at the plant were Friday, Saturday, and Sunday, and her unpaid days off were Tuesday and Wednesday. (*Id.* 39:20–24, 40:4–6, 42:8–11.)

The Plaintiff was the second employee to attend the paramedic training. (*Id.* 35:19–36:15.) Before the training, the Plaintiff's regular schedule was to work Sunday through Thursday, and take days off Friday and Saturday. (*Id.* 53:2–5.)[2] The Plaintiff requested that her schedule during the paramedic training be five paid days off—Monday through Friday—without

---

[1] Throughout the briefing, Rosales's first name is spelled as both "Ester" and "Esther." The Court utilizes the first spelling throughout to be consistent.

[2] "At the time that [the Plaintiff] entered the program, she was filling in for Regina Chandler and her days off were Saturday and Sunday. She worked on a schedule where she rotated on all three shifts, 6 a.m. to 2 p.m., 2 p.m. to 10 p.m., and 10 p.m. to 6 a.m. (days, evenings and midnights)." (Gipson Aff. ¶ 25, Ex. A.)

2

having to work at the plant during the fifteen-week paramedic training. (*Id.* 47:24–48:1, Exs. 6, 8.) She sought more time off than Rosales because she "needed more time to study." (*Id.* 48:2.)[3]

The Defendant denied the Plaintiff's requests but "offered her the same accommodation as Rosales—attend paramedic training on Monday and Thursday (paid), work at the plant on Sunday, Tuesday, and Wednesday, and have Friday and Saturday off." (Def.'s Mem. in Supp. of Summ. J. 6, ECF No. 52 (citing Gipson Dep. 53:12–16, 54:1, Exs. 7–8).) Because this adjusted schedule "caused her to be scheduled to work an overnight shift that began at 10:00 p.m. the same day that she had attended paramedic training," the Plaintiff filed a grievance. (Gipson Dep. 56:15–20.) On October 24, 2012, a grievance hearing was held with the Plaintiff, the Defendant, and the Union, at which the Defendant offered three schedule options to the Plaintiff:

- Continue to work Sunday, Tuesday, and Wednesday at the plant, attend paramedic training (paid) on Mondays and Thursdays, and have Friday and Saturday off;

- Work at the plant Friday, Saturday and Sunday, attend paramedic training (paid) on Mondays and Thursdays, and have Tuesday and Wednesday off;

- Same as option one, except that on those weeks when the rotating schedule had the Plaintiff working nights, she would be given a day or afternoon shift, work in an open shift and at the rate of pay for the position she was assuming, and she would not be able to bump employees regularly scheduled to work the day or afternoon shift.

(Gipson Dep. 47:18–21, 49:13–16, 51:18–52:10, Ex. 8.) No other employee, before or after the Plaintiff, was given three options when they took the paramedic training. (Rose Dep. 106:19–25, ECF No. 52.) The Union agreed that the three options that the Defendant offered were consistent with the CBA and with accommodations offered to other employees. (Gibson Dep. Ex. 8.) Ultimately, the Plaintiff chose the first option "because she did not want to risk possibly being

---

[3] The parties dispute the details of the Plaintiff's second requested schedule. The Defendant states that the Plaintiff "asked that if she was required to work at the plant at all, that she work only the 6 a.m. to 2 p.m. shift on Tuesday, Wednesday, and/or Friday." (Gipson Dep. 47:24–48:1, Exs. 6, 8.) The Plaintiff states that she requested "to be off on Wednesday and to work the open turn on Saturday." (Gipson Aff. ¶ 15.) Whatever the specifics, the request was ultimately denied.

3

assigned to a lower pay grade, or a day or afternoon position, during the weeks in which she would normally be scheduled to work nights." (Def.'s Mem. 6–7 (citing Gibson Dep. 136:21–137:24, Ex. 8.)

The Plaintiff failed her practical exam for the paramedic training program three times and was dismissed from the program. (Gipson Dep. 63:2–24, 65:1–4.) An appeal to Methodist Hospital regarding her dismissal was not successful, and her request to be reinstated to the program was denied. (*Id.* 65:8–15, Ex. 11.)

B.  **Facts Relating to the Retaliation Claim**

The Defendant has in place a progressive discipline policy for violations of its work rules or policies. "The steps of progressive discipline are: (1) written reprimand; (2) one-day suspension; (3) three-day suspension; and (4) five-day suspension preliminary to discharge. When making suspension and discharge decisions, the [Defendant] may consider records relevant to an employee's conduct for up to five years and any other discipline the employee received during the previous two years." (Rose Decl. ¶ 8.) Prior to 2012, the Plaintiff had no disciplinary history. (Gipson Dep. 114:2–8.)

On July 5, 2012, the Plaintiff received a "step one" written reprimand for unauthorized use of computers and internet while at work. (*Id.* 101:15–103:7, Ex. 13.)[4] On April 23, 2013, the Plaintiff was issued a "step two" one-day suspension for insubordination after refusing to work as a "Squad 2" ambulance passenger, as instructed by her supervisor, and instead working as a "Squad 1" ambulance driver. (*Id.* 103:8–106:10, 130:10–132:10, Ex. 14.) On November 19, 2013, the Plaintiff was issued a "step three" three-day suspension for insubordination because on

---

[4] According to the Defendant, the majority of employees in the Plaintiff's Department received similar discipline for internet usage at one point or another. (Rose Decl. ¶ 9.)

4

two separate occasions she was directed to call in security checks over the radio, as required by Department policy, and she refused to do so. (*Id.* 106:11–111:4, Ex. 15; Rose Decl. ¶ 10.)

The Plaintiff's "step four" five-day suspension preliminary to discharge occurred on May 21, 2014, as the result of a false report investigation. On April 6, 2014, the Plaintiff reportedly told her shift leader that she "witnessed an employee not do a security check correctly." (Rose Dep. 54:20–55:12, Ex. B.) On multiple occasions thereafter, the Plaintiff's supervisor "instructed her to write a report that she had witnessed her coworker calling in an assigned security check that he had not actually completed." (*Id.* 53:4–55:11, Ex. E.) The Plaintiff was reportedly angry that her supervisor had identified her as the person who witnessed the employee falsify his security check. (*See id.*) Ultimately, on May 7, 2014, the Plaintiff submitted a report in which she stated that she had no recollection of the coworker falsely reporting his assigned security check. (*Id* Ex. E.)

Because the Defendant "believed that she lied about having no recollection of witnessing and reporting her coworker for failing to complete an assigned security check," the Plaintiff received her "step four" discipline. (*Id.*) Ultimately, an arbitrator decided that the Defendant did not meet its high burden of proof that Gipson's termination was supported by just cause, as required by the CBA, reinstated her, awarded her back pay for any work she had missed, and rescinded the suspension and discharge from her employment record. (Gipson Dep. 86:17–21; Rose Dep. 56:13–59:20, Ex. C.)

On September 18, 2012, Gipson filed a charge with the EEOC alleging that the Defendant had discriminated against her by not permitting her to change her schedule with regard to the paramedic training, which was dismissed on July 26, 2013. (Hartman Decl. ¶¶ 4–5, Exs. A–B, ECF No. 52.) Then, on October 21, 2013, the Plaintiff filed this lawsuit. In a second

EEOC filing on October 26, 2013, the Plaintiff alleged that she was unfairly disciplined, which was dismissed on June 24, 2014. (*Id.* ¶¶ 6–7, Ex. C.) Then, on July 14, 2014, the Plaintiff amended her Complaint to include retaliatory discharge claims.

**STANDARD OF REVIEW**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the nonmoving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in that party's favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court should only deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (first citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); then citing *Swearnigen-El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. [A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and

6

avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## DISCUSSION

Discrimination under Title VII may be proven under either the direct or burden-shifting methods of proof. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). "Under the 'direct method,' the plaintiff may avoid summary judgment by presenting sufficient evidence . . . that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). "Regardless of the type of evidence presented, the direct method is used when that evidence would permit the trier of fact to find that unlawful discrimination caused the adverse job action." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014); *see also Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013) (stating that the relevant analysis is whether a reasonable jury could infer prohibited discrimination).

Under the burden-shifting method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff meets her initial burden for a Title VII claim by showing that: (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 815 (7th Cir. 2015); *Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 511–12 (7th Cir. 2012). If the plaintiff meets her burden, then the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Preddie*, 799 F.3d at 815 (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234

7

(7th Cir. 2014)). "Pretext means a lie, specifically a phony reason for some action." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002).

The Plaintiff relies upon both the *McDonnell Douglas* burden-shifting framework and the direct method to prove her case, but the Defendant argues that the proffered evidence fails to meet the burden of proof under either framework.

**A.      Discrimination—*McDonnell Douglas* Framework**

As an initial matter, the Court finds that, because the Plaintiff is a Black, Jamaican-American woman, her race and gender both denote membership in a protected class for purposes of her discrimination claims. Next, the Court finds that the Plaintiff was meeting the Defendant's legitimate expectations with regard to her job performance, and the Defendant does not contest this fact. The Court turns to the remaining elements of the prima facie case.

**1.      *Materially Adverse Employment Action***

"The requirement that a plaintiff show she suffered an adverse employment action as a result of her employer's alleged discrimination is an element of any Title VII claim." *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014). Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment" on the basis of the individual's race or sex. 42 U.S.C. § 2000e-2(a)(1). Title VII's prohibition against discrimination with respect to terms, conditions, or privileges of employment reaches only "material, sufficiently important alterations of the employment relationship (often referred to as 'adverse employment actions')"). *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 916–17 (7th Cir. 2007) (citing *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006)). "A

8

cognizable adverse employment action is a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 838 (7th Cir. 2008) (quoting *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000)). The "purpose of the adverse employment action requirement is to provide a reasonable limiting principle for the type of conduct actionable under the statute." *Phelan v. Cook Cty.*, 463 F.3d 773, 780 (7th Cir. 2006). "[A] statute which forbids *employment* discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace," *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000).

The Plaintiff argues that the Defendant's failure to provide an amenable work schedule while she was in the paramedic training qualified as an adverse employment action because the work schedule caused her to fail the certification process and, "in the event of a layoff, an employee with . . . paramedic certification, would be retained over a senior employee without the certification."[5] (Jones Aff. ¶¶ 9–11, ECF No. 56-5.) The Defendant notes that "it is undisputed that it was the Hospital that operated the voluntary training course and removed [the Plaintiff] from the program for failing her practical exam," and such failure cannot be attributed to the Defendant as an adverse employment action. (Def. Mem. 13.) In addition, the work schedule and accommodations that the Defendant offered during the training period did not result in reduced pay for the Plaintiff,[6] decrease her job responsibilities, or materially alter the terms or conditions of her employment, as she is still employed with the Defendant.

---

[5] The Plaintiff also argues that she had "to take out loans or pay for" her training because she failed to successfully complete the paramedic training and achieve certification. (Pl.'s Opp'n 10.) But because the Plaintiff failed to offer any evidence to support this argument, the Court will not consider it as a possible adverse employment action.

[6] One of the accommodation schedules left open the possibility that the Plaintiff would be paid a lesser rate when she took shifts that were not in the evening. (Puckett Aff. ¶ 18, ECF No 56-4).

The Court agrees with the Defendant. To begin, the Plaintiff's failure to obtain her certification from the Hospital that provided paramedic training is not a materially adverse employment action attributable to the Defendant. But the causal argument—that the Defendant's failure to accommodate the Plaintiff's work schedule while she was enrolled in the training caused her to miss out on later opportunities that she would have enjoyed had she obtained her certification—also fails. It is highly speculative, and the Seventh Circuit has held that "[h]ypothetical possibilities are not materially adverse employment actions." *Probst v. Ashcroft*, 25 F. App'x 469, 472 (7th Cir. 2001); *Sweeney v. West*, F.3d 550, 556 (7th Cir. 1998). And a change in an employee's shift or work hours, in and of itself, is not an adverse employment action when her "pay and job title remain[] the same, and she suffer[s] no significantly diminished job responsibilities." *Grube*, 257 F.3d at 728. Here, the Plaintiff's pay, job title, and responsibilities remained unchanged after she failed to obtain certification. Just because the Defendant did not meet all of the Plaintiff's demands regarding her work schedule and accommodations while she was training does not transform the Defendant's decision into an adverse employment action. *See id.* (noting that allowing "a mere change in working hours" to be actionable under Title VII would prevent employers from "adapting and maintaining employee's work schedules to fit within the parameters of their business needs.").

### 2. *More Favorable Treatment for Similarly-Situated Employees*

Even assuming the evidence qualified as an adverse employment action, the Plaintiff would have to prove that she was treated less favorably than a similarly-situated employee. A similarly situated employee is one whose performance, qualifications, and conduct were comparable in "all material respects." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 274 (7th Cir. 2004) (first citing *Durkin v. City of Chi.*, 341 F.3d 606, 613 (7th Cir. 2003); then citing

*Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002)). A court looks at all the factors that are relevant within the context of the case, which may include whether the employees held the same job description, were subject to the same standards, or had comparable experience, education, and qualifications, as long as the employer took these factors into account when making the personnel decision in question. *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 810 (7th Cir. 2011); *Patterson*, 281 F.3d at 680.

In support of its Motion, the Defendant argues that the Plaintiff was actually treated better than all similarly situated employees who took the training. Whereas Rosales (who was not black or a Jamaican-American) was given one scheduling accommodation when she took the paramedic training, the Plaintiff received three accommodation options:

- Continue to work Sunday, Tuesday, and Wednesday at the plant, attend paramedic training (paid) on Mondays and Thursdays, and have Friday and Saturday off;

- Work at the plant Friday, Saturday and Sunday, attend paramedic training (paid) on Mondays and Thursdays, and have Tuesday and Wednesday off (the same as was offered Rosales);

- Same as option one, except that on those weeks when the rotating schedule had the Plaintiff working nights, she would be given a day or afternoon shift, work in an open shift and at the rate of pay for the position she was assuming, and she would not be able to bump employees regularly scheduled to work the day or afternoon shift.

(Gipson Dep. 47:18–21, 49:13–16, 51:18–52:10, Ex. 8.) These accommodations were more favorable because no employees attending the paramedic training were given the schedule that the Plaintiff initially requested: five paid days off.

In opposition, the Plaintiff argues that she was treated less favorably because Rosales was given scheduling accommodations that enabled her to successfully complete the paramedic training program. First, Rosales did not have to "beg" for scheduling accommodations as her manager "worked out the best schedule . . . in advance." (Gipson Dep. 49:17–20.) By contrast,

11

the Plaintiff's request to have Wednesday off and to work the open Saturday turn was declined, as was her request to have the full week off for the training. Second, the Plaintiff was actually just given the first and third aforementioned options, neither of which was favorable: the first option "was for [the Plaintiff] to simply continue to work the same schedule she was seeking a change from" (Pl.'s Opp'n 11), and the third option excluded her from working midnights but would have subjected her to lower than her rate of pay. (Puckett Aff. ¶ 18).[7] An option to take Tuesday and Wednesday off, as Rosales had received, "was never offered to her." (Gipson Aff. ¶ 22.) Finally, she claims that the Union did not "agree[] that the scheduling options . . . offered [to the Plaintiff] w[ere] consistent with the CBA and the scheduling accommodations . . . offered other employees." (Pl.'s Opp'n 13 (citing Def. Mem. 6).)

The evidence does not show that the Plaintiff was treated less favorably. Whether or not the Plaintiff's manager "worked out the best schedule . . . in advance" (Gipson Dep. 49:17–20), such evidence does not show that her manager treated her less favorably and blocked her ability to obtain a better schedule. And as is discussed in greater detail below, the Defendant had a legitimate reason to reject the Plaintiff's proposed schedules: employees were only allowed to take off two days for the training, not five days. Further, the options offered to the Plaintiff tend to show more, not less, favorable treatment for her than those similarly-situated. In her briefing, the Plaintiff argued that she was not given the same choice as Rosales and instead was only offered option one (which was not an accommodation because it was the same schedule she currently had) and option three (which was less favorable because it could involve a pay cut).[8]

---

[7] In addition, the Plaintiff argues that the third accommodation contravened the paramedic training agreement, which stated that "the employee will be paid, at their incumbent rate, for all hours that are spent in the classroom and in clinical training." (Paramedic/EMT Training Form, ECF No. 56-3.)

[8] Even if this option was contrary to the paramedic training agreement because it would have paid her less at times, it did not actually result in her being paid less and she was still given two other options that were also favorable

The proffered evidence shows this argument to be without merit: first, the meeting notes from the grievance hearing show that the Plaintiff was in attendance and that she was offered three separate options, including the one that Rosales received, and which received Union approval (Gipson Dep. Ex. 8); second, the EEOC's notice dismissing the Plaintiff's claim found that the Defendant had offered the Plaintiff the same schedule as Rosales (Hartman Decl. Ex. B).[9] Although each option had its own pros and cons, the Plaintiff's "mere unhappiness and inconvenience" with those various pros and cons is "not actionable under Title VII." *Haywood v. Lucent Techs.*, 323 F.3d 524, 532 (7th Cir. 2003).

Lastly, the Plaintiff argued that other non-black employees—Loretta Harper, Deb Houston, and Juanita Purnell—in the paramedic training program were accommodated beyond just Rosales. (Gipson Dep. 67:11–68:9.) But the Plaintiff's deposition testimony is the only evidence in the record regarding any of these individuals, and it fails to show how the Plaintiff was treated less favorably beyond the fact that she did not pass the training and others did.[10]

---

[9] The Defendant also argued that the Plaintiff's own deposition testimony contradicted her position that she was never offered the same accommodation as Rosales. (*See* Reply 8 (citing Gipson Dep. 81:11–22).) But those cited portions of the Plaintiff's Deposition were omitted from the parties' briefing and thus are not before the Court. Nevertheless, the remaining proffered evidence does contradict the Plaintiff's position, so the omission of those cited portions of the Plaintiff's Deposition is not fatal.

[10] The Plaintiff was specifically asked

> Q: Can you give – can you give examples of . . . who has been treated differently?
> A: All – you have Loretta Harper. You have Deb Houston who just went to paramedic school right after me, and you have Juanita Purnell and Ester Rosales so those four.
> Q: And on what basis were they treated differently?
> A: Deb Houston went to paramedic school after me. She finished the program but never finished the clinical and all the rest of the program. She was allowed by the company to go back and do extras. I was not given that opportunity. I wasn't given an opportunity to switch one day so I could study to pass the tests and to get extra training.

(Gipson Dep. 67:11–68:9.)

Based on the evidence, the Plaintiff has failed to carry her burden of proof in establishing the prima facie case for discrimination under the *McDonnell Douglas* framework.[11]

B.  **Discrimination—Direct Method of Proof**

Under the direct method of proof, the relevant inquiry is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (stating that courts must consider the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself"). The Court finds no basis upon which a reasonable factfinder could conclude that the Plaintiff suffered an adverse action because of her race. As discussed above, the Plaintiff has

---

[11] Because the Plaintiff failed to carry her burden of proof, the burden-shifting provisions do not apply to this case. Were the burden shifting provisions applicable, the Court would nonetheless have found that the Defendant provided a "legitimate, nondiscriminatory reason" for its actions. *Preddie*, 799 F.3d at 815. The Defendant argued that it had to maintain around-the-clock security and emergency services, as well as to manage labor costs. As such, the Plaintiff's requested schedule could not be accommodated because the number of employees allowed to take the paramedic training was limited at any one time. Regulating how employees are scheduled and attempting to control labor costs are legitimate, non-discriminatory reasons for taking an adverse employment action. *See Scruggs v. Garst Seed Co.*, 587 F.3d 832, 839 (7th Cir. 2009); *Allen v. Potter*, 115 F. App'x 854, 864 (7th Cir. 2004).

Furthermore, the Court would have found that the Plaintiff failed to demonstrate that the Defendant's explanation was merely pretext, which means it was factually baseless, "lies" or "phony," or insufficiently motivated the course of action. *Millbrook*, 280 F.3d at 1175; *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001). Proffered evidence of pretext may be direct, circumstantial, or statistical, but must be considered in its totality. *Patterson v. McLean Credit Union*, 491 U.S. 164, 187 (1989). The Plaintiff essentially argued that the Defendant's explanation was pretext because it did not make business sense, as the Plaintiff's initial request would have saved the Defendant money "because she was being paid at a higher rate while filling in" for another employee at the time. (Gipson Aff. ¶ 26.) Similarly, allowing an employee like Rosales to take off work "four days in a row" to attend paramedic training and study did not actually provide for around-the-clock security.

This argument misconstrues what qualifies as pretext. Just because the Plaintiff's requested schedule would have saved the Defendant more money than what the Defendant ultimately chose does not transform the Defendant's explanation into a pretext for discrimination. Indeed, the Defendant's justification for its decision was consistent with how it chose to accommodate Rosales, and the totality of the evidence fails to show that the denial of the Plaintiff's requested schedule was *because of* her race. *See Argyropolous v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2006) (finding that a district court should not be a "super personnel review board that second-guesses [an employer's] facially legitimate business decisions").

failed to provide evidence that similarly-situated comparators were treated differently, let alone more favorably, than she was. Both Rosales and the Plaintiff were offered the same scheduling accommodation, and the Plaintiff was given additional options from which to choose. Additionally, there is no circumstantial evidence, such as ambiguous statements, suspicious timing, or pretext as discussed above, upon which the Court could find racially discriminatory animus. *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 889–901 (7th Cir. 2016) ("Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus.").[12] For the most part, the Defendant's evidence is her own subjective testimony that she was treated unfairly because of her ancestry, but "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014) (internal quotation marks omitted). Accordingly, the Defendant is entitled to judgment as a matter of law with regard to the Plaintiff's claim for racial discrimination.

**C.     Retaliation**

In addition to race discrimination, the Plaintiff argues that she was disciplined and eventually terminated in retaliation for her September 2012 EEOC charge and for her lawsuit in October 2013. She seeks to prove this claim under both the direct method and the burden-shifting framework. Under the direct method, the Plaintiff must show that she engaged in (1) statutorily

---

[12] The Plaintiff argues that the Court may not rely upon Rose's testimony because "Rose has represented the interests of Defendant by, inter alia, responding to [the Plaintiff's] numerous grievances against him, participating in Defendant's responses to [Plaintiff's] EEOC charges, answering [Plaintiff's] interrogatories and providing an affidavit in Defendant's Motion for Summary Judgment." (Pl.'s Opp'n 23.) But even without Rose's testimony, the Court would still find a lack of evidence upon which a reasonable factfinder could find race discrimination under the direct method.

15

protected activity, an (2) adverse employment action, and a (3) causal connection between the two. *Jajeh v. Cty. of Cook*, 678 F.3d 560, 570 (7th Cir. 2012). The prima facie case for the burden-shifting method is the same as that articulated in *McDonnell Douglas*, except that the plaintiff must have engaged in statutorily protected activity and identify comparators who did not, thereby demonstrating a causal connection. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007).

To support its Motion, the Defendant argues that the Plaintiff cannot show that the filing of her EEOC charge and her lawsuit *caused* her discipline and discharge. *Univ of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). A causal nexus is established with evidence of suspicious timing, ambiguous statements or behavior towards other employees in the protected group, evidence (statistical or otherwise) that similarly-situated employees outside the protected group received better treatment systemically, and evidence that the employer offered a pretextual reason for the adverse employment action. *Jajeh*, 678 F.3d at 570. Suspicious timing alone is insufficient. *Lumpkins-Benford v. Allstate Ins. Co.*, 567 F. App'x 452, 455 (7th Cir. 2014).

The Plaintiff argues that there is sufficient circumstantial evidence from which a jury could find retaliation. The Plaintiff claims that she was never written up for "any of those particular offenses in her entire 15-year career with the Defendant" prior to 2013. (Gipson Dep. 114:2–8.) That fact, coupled with the fact that the Plaintiff complained to the EEOC in 2012 and then filed her lawsuit in 2013, is enough, the Plaintiff argues, for this Court to find suspicious timing. Furthermore, the Plaintiff thinks that the length of time in between disciplinary incidents is short enough because the Defendant could not just fire her after her first step with the progressive discipline policy, but would have to graduate her up the chain. (*Id.* 115:4–8.)

16

After assessing the evidence presented, the Court does not find that the Plaintiff has met her burden of proof for a retaliation claim under the direct method. First, the evidence does not show suspicious timing. The Plaintiff was disciplined seven months after filing her charge of discrimination with the EEOC, when she was given a one-day suspension in April 2013. But the Plaintiff was not discharged until May 2014, which was 20 months after her charge of discrimination and seven months after her lawsuit was filed but four months before the Defendant was served with the Complaint.[13] Second, there is no evidence that the Defendant made ambiguous statements. Third, there is no evidence that similarly-situated employees were treated more favorably. Both the Plaintiff and her coworkers received discipline for unauthorized use of computers and the internet, and also for submitting false reports.[14] Finally, the evidence does not show pretext because the Plaintiff was terminated according to the Defendant's established procedure of progressive discipline, not arbitrarily. Indeed, the arbitrator's later determination that the Plaintiff should not have been terminated tends to show an absence of pretext, as the arbitrator found that the Defendant "honestly believed" that it was making an appropriate decision. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016).[15]

Similarly, the Court does not find that the Plaintiff has established a prima facie case of retaliation under the burden-shifting framework. In addition to having no relevant comparators

---

[13] Further undercutting the suspicious timing argument, the Court takes judicial notice that this is not the first lawsuit within the Northern District of Indiana in which the Plaintiff sued her employer. *See Gipson v. ArcelorMittal Steel USA*, No. 2:10-CV-492, 2013 WL 214237 (Jan. 18, 2013).

[14] The Plaintiff points to a white coworker who falsified his security check report and only received a one-day suspension, as opposed to the Plaintiff's termination. However, that is not a valid comparison because he was on "step two" of the Defendant's progressive discipline while the Plaintiff had exhausted earlier steps and was at "step four" suspension pending discharge.

[15] Although the Plaintiff claims that "Rose was aware that [the Plaintiff] thought he was a racist" (Rose Dep. 34:21–35:25), it is unclear how this would tend to show pretext—beyond the Plaintiff's own subjective belief in the process's unfairness—because Rose was not the sole disciplinarian. *See Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 (7th Cir. 1996) (noting that a plaintiff's belief that an employer's action is unfair is insufficient to show pretext).

who complained of discrimination, the evidence shows that the Plaintiff was not meeting her employer's legitimate job-related expectations, as her ultimate termination came as a result of the progressive disciplinary process and numerous complaints with her job performance, i.e., her unauthorized internet use and her failure to perform certain job assignments. Finally, there is no evidence that the Defendant's decision to terminate was pretextual, as was discussed above. As such, the evidence does not show that Defendant's actions were based upon the Plaintiff's race or protected activity. Accordingly, the Defendant is entitled to judgment as a matter of law with regard to the Plaintiff's claims for retaliation.

## CONCLUSION

For the foregoing reasons, Defendant ArcelorMittal Steel USA's Motion for Summary Judgment [ECF No. 51] is GRANTED.

SO ORDERED on May 8, 2017.

    s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT